**HARTFORD FIRE INSURANCE COMPANY, as Subrogee of Middletown Concrete Products, Inc., and BTO, Limited Partnership, Plaintiffs,**

v.

**PETTINARO CONSTRUCTION COMPANY, INC., Pettinaro Brothers, Inc., Active Crane Rentals, Inc., Bruce Industrial Company, Inc., Rekers GMBH, Hydrotile Machinery Co., d/b/a B.C. Manufacturing Co., Donald Karr, Jr. and Michael Dooling, Defendants.**

Civ. A. No. 91–702 SLR.

United States District Court,
D. Delaware.

March 30, 1993.

Michael F. Bonkowski, Semmes, Bowen and Semmes, Wilmington, DE (Douglas B. Fox, Cozen and O'Connor, Philadelphia, PA, of counsel), for plaintiffs.

John D. Balaguer, White and Williams, Wilmington, DE (William J. Schmidt, Philadelphia, PA, of counsel), for defendant Pettinaro Const. Co., Inc.

Michael K. Tighe, and James S. Yoder, Berg, Tighe & Cottrell, Wilmington, DE, for defendants Active Crane Rentals, Inc., Donald Karr and Michael Dooling.

James F. Bailey, and Brian Thomas McNelis, Bailey & Wetzel, Wilmington, DE, for defendant Bruce Indus. Co., Inc.

Daniel L. McKenty, Swartz, Campbell & Detweiler, Wilmington, DE, for defendant Hydrotile Mach. Co.

Daniel F. Wolcott, Jr., Potter Anderson & Corroon, Wilmington, DE, for Rekers GmbH.

## MEMORANDUM ORDER

SUE L. ROBINSON, District Judge.

This is a diversity action brought by Hartford Fire Insurance Company ("Hartford") as subrogee to the rights of its insureds, Middletown Concrete Products, Inc. and BTO Limited Partnership (collectively referred to herein as "Middletown"), in connection with a crane accident which occurred on January 16, 1990, at Middletown's newly-constructed manufacturing facility in Middletown, Delaware (the "Middletown Facility").

Hartford commenced this action after allegedly making payments to Middletown in the approximate amount of $460,000 for property and interruption of business damages arising from this accident.

Before the Court are various motions for summary judgment.

### Factual Background

Middletown contracted with defendant Hydrotile Machinery Co. ("Hydrotile") for the purchase of a hoist system to be installed at the Middletown Facility.[1] Defendant Rekers GMBH ("Rekers") subcontracted with Hydrotile "for the purchase, erection and supervision of installation of the equipment." (D.I. 182, Exhibit A at ¶ 10). Middletown contracted with Pettinaro Construction Company ("Pettinaro") to act as its construction manager in connection with the Middletown construction project. As part of its duties as construction manager, Pettinaro undertook certain responsibilities regarding the installation of the hoist system. Pettinaro in turn contracted with Active Crane Rentals, Inc. ("Active") to provide two cranes and two operators to assist in performing the installation procedure. (D.I. 2 at ¶ 13). Active supplied said cranes and "contracted with and/or otherwise engaged defendants" Michael Dooling ("Dooling") and Donald Karr ("Karr") to operate the cranes. (D.I. 2 at ¶ 14).

As to defendants' negligence and liability for the damages arising from the crane accident at issue in this case, Hartford simply alleges in its bare bones pleading that "[d]uring the performance of the [hoist system installation procedure], one of the aforesaid cranes tipped over on its side, as a result of the joint and/or several negligence of the defendants, proximately causing" Middletown's damages. (D.I. 2 at ¶ 17). It appears from the record that the crane accident occurred because the cranes selected were of an insufficient size to lift the hoist system for installation. It further appears that there was substantial confusion among the parties involved as to the weight of the hoist system[2] and that said confusion, coupled with the failure of any of the parties to ascertain the precise weight of the system or to ensure that the cranes selected for the task were sufficient, resulted in this dangerous mishap.

Defendant Active moves for summary judgment as to the claim of plaintiff against it and as to its cross-claim against defendant Pettinaro. Defendant Karr moves for summary judgment as to plaintiff's negligence claim against him. Hydrotile also moves for summary judgment with respect to plaintiff's claim against it. Likewise, Rekers moves for summary judgment as to plaintiff's negligence claim against it. For the following reasons, the Court concludes that the existence of genuine issues of material fact preclude summary disposition of these negligence claims and that the motions accordingly must be denied.

### Discussion

The Court will consider each of the pending summary judgment motions seriatim.

#### Active's Motions for Summary Judgment

As related above, Pettinaro, while acting as Middletown's representative and project manager, contracted with Active Crane for supply of two cranes and two crane operators in order to facilitate lift of the hoist system. The record indicates that Mr. David McCormick ("McCormick") of Pettinaro telephoned Active Crane on the afternoon of January 15, 1990 to discuss rental of two manned cranes for the following day. McCormick had a telephone conversation with Active employee Steve Lloyd Schmeusser ("Schmeusser") regarding lease of the cranes. The record indicates that McCormick and Schmeusser discussed various matters relating to lease of the cranes, including price of the manned cranes, size of the cranes needed, as well as where and when the cranes were to be deliv-

---

1. It appears from the record that Wilmington Materials, on Middletown's behalf, entered into the contract of sale with Hydrotile, although the parties have not attached any legal significance to this fact. (See D.I. 171 at 5 n. 1).

2. The Court finds that the record is unclear as to the actual weight of the hoist system and thus concludes for present purposes that there is a genuine issue of material fact regarding this issue. The Court will assume for purposes of this Memorandum Opinion that the hoist system weighed approximately 50,000 pounds.

ered. It is undisputed that McCormick and Schmeusser did not discuss matters of which party, Active or Pettinaro, would be liable in the event of an accident involving the leased cranes.

On the following day, January 16, 1900, the day of the crane accident, the cranes and their operators arrived at the Middletown Facility. At that time, one of the crane operators presented Mr. Thomas Durnan of Pettinaro with "RENTAL AGREEMENT" documents. Each of these documents contained certain information relating to the crane rental agreement between Active and Pettinaro, including the size of the crane, the date of rental and the place of delivery.[3] The "RENTAL AGREEMENT" documents also included a "RELEASE" provision which provides as follows:

> Lessor agrees to supply the above equipment and necessary personnel to operate same under direct and sole supervision of the Lessee for an eight (8) hour minimum day (8:00–4:30). Lessee agrees to hold lessor harmless for loss, damage and expense resulting from the operation of the above mentioned equipment either bodily injury or property damage including damage or loss to the equipment leased hereby, and agrees to defend lessor from all suits resulting from above operation. The lessee further agrees to maintain Public Liability insurance in the amount of $500,-000 for bodily injuries and $250,000 for property damage in favor of Active Crane Rentals, Inc., covering the operation of the above equipment.

(D.I. 90, Exhibit A).

Active's cross-claim against Pettinaro is grounded on this "RELEASE" provision contained in the "RENTAL AGREEMENT" documents allegedly signed by Pettinaro employee Durnan at the time that Active delivered the two leased cranes to the Middletown Facility. Active claims that said release provision requires Pettinaro to indemnify, provide liability insurance and defend Active "for loss, damage and expense resulting from the operation of the leased equipment," as well as to pay "all litigation expenses of Active ... including attorneys' fees for defending the instant action." (D.I. 90 at ¶¶ 7, 9, 11).

Pettinaro initially responds to Active's contractual indemnity claim by conceding that under the terms of the contract "the lessee [here Pettinaro] agrees to hold the lessor [here Active] harmless for loss, damage and expense from property damage resulting from the operation of the cranes" and "further agrees to defend the lessor from all suits resulting from the operation of the cranes." (D.I. 110 at ¶ 10 (emphasis removed)). Likewise, Pettinaro agrees that the indemnity clause requires the lessee "to maintain public liability insurance in favor of the lessor in the amount of $250,000 for property damage covering the operation of the cranes." (D.I. 110 at ¶ 10 (emphasis removed)). Moreover, Pettinaro concedes that one of its employees signed the subject lease agreements containing the indemnity clause at issue. (D.I. 100 at ¶ 8; D.I. 109 at ¶ 3).

Pettinaro nonetheless seeks to avoid potential liability under the indemnity provision by contending that "Pettinaro agreed to lease the two cranes and operators from Active for a stated price; however, Pettinaro never agreed to be bound under the express terms of the release." (D.I. 100 at ¶ 11). Pettinaro further asserts that "[t]here is no record evidence whatsoever that the terms and conditions of the release were in any way discussed, negotiated or agreed to by Pettinaro and Active; and thus, it is a question of fact for the jury whether the parties intended that Pettinaro would be bound by the release when Mr. Thomas Durnan signed the rental agreements." (D.I. 168 at 7 (citing, *inter alia, Leeds v. First Allied Connecticut Corp.,* 521 A.2d 1095 (Del.Ch.1986)).

The Court disagrees. Pettinaro essentially argues that it should not be bound by the terms of the release provision because (1) it did not intend to be so bound and (2) Durnan, its employee, did not read the "RENTAL AGREEMENT" documents containing

---

**3.** Although the "RENTAL AGREEMENT" documents did not contain any price terms, there is no dispute between Active and Pettinaro regarding the agreed-upon price for rental of the manned cranes.

the release term at the time he signed those papers.

■ The Court rejects the first argument because the issue here is not whether Pettinaro *subjectively* intended to be bound by the release provision. Rather, the question is whether Pettinaro manifested an intention to be bound by the release term through its overt acts and statements, *i.e.*, whether there was an "objective manifestation of assent" on the part of Pettinaro. *See Leeds*, 521 A.2d at 1101. Pettinaro's argument apparently is that there was not an "objective manifestation of assent" to the release provision because the parties did not discuss this contractual term when McCormick telephoned Active Crane in order to place Pettinaro's order for lease of two cranes on the following day. Clearly, Pettinaro did not objectively manifest an intention to be bound by the release provision in connection with said telephone conversation since the lease provision was not addressed therein. However, on the following day when the cranes arrived and Pet-

tinaro's representative received and signed "RENTAL AGREEMENTS" containing the release provision, there can be no question that Pettinaro at that point clearly had conveyed "objective manifestation of assent" to the release term.

Indeed, the deposition testimony of Durnan, Pettinaro's employee who signed the agreements, demonstrates that he understood precisely what he was signing—namely, equipment rental agreements.[4] The Court finds that Durnan's signing of the lease agreements which contained the release term constituted an unequivocal objective manifestation of Pettinaro's assent to the release provision.[5] The issue of Pettinaro's objective intention to be bound by the release term does not present a jury question because there is no evidence in the record upon which a reasonable juror could conclude that Pettinaro did not objectively manifest such an intention. In other words, the material facts with respect to this issue are undisput-

4. Durnan gave the following testimony at his deposition:

Q: Now, were you given rental agreements to sign, that is given by one of the Active Crane operators?
A: Yes.
Q: And did you sign them?
A: Right after the accident.
Q: Did you sign either one of them before the accident?
A: I don't remember.
Q: Had you worked with Active Crane rentals before?
A: Yes.
Q: Many times?
A: Yes.
Q: Had you signed these rental agreements before?
A: Yes.
Q: On behalf of Pettinaro?
A: No.
Q: On behalf of other companies for whom you worked?
A: Yes.
Q: Is it customary in your industry for a construction superintendent such as yourself to sign these types of agreements?
A: Yes.
Q: Did you object to signing them?
A: No.
Q: You weren't put under any pressure to sign them by anyone?
A: No.
Q: You signed them of your own free will?
A: That's right.
(D.I. 169, Exhibit D at 38–39).

Additionally, Durnan further testified as follows:

Q: I'll hand you Durnan Exhibit Number 3, and ask you to look that over and state whether you can identify it?
A: Uh-huh. Yes.
Q: What are these documents which are Durnan Exhibit Number 3?
A: Well, it's a slip that we have to sign when the crane arrives on the job. *You sign it as an agreement with Active Crane and us to pay for it.*
Q: Okay. And on each of those pages, does your signature appear?
A: [Yes].
Q: What did you do with the rental agreements after you signed them?

*       *       *       *       *       *

A: Give [sic] them back to the operator.
Q: The crane operator?
A: Yes.
Q: That's who gave them to you to sign?
A: Yes.
Q: And you signed them and gave them back?
A: Yes.
(D.I. 169, Exhibit D at 54–55 (emphasis supplied)).

5. The record further indicates that Active and Pettinaro had a prior course of dealings which apparently included these same rental agreements, although there is nothing in the record indicating that Pettinaro ever objected to the release provision contained therein. (*See* D.I. 169, Exhibit A at 39).

ed and those undisputed material facts reasonably support only one conclusion under applicable contract law—that Pettinaro is bound by the release provision based on its objective manifestation of intent to be so bound.

As to Pettinaro's second argument, *i.e.*, that it cannot be bound by the release provision because Durnan signed the agreement without first reading[6] its terms and without realizing that his signature would bind (or at least would constitute objective manifestation of assent to be bound by that contract provision) Pettinaro to the release agreement, relevant Delaware caselaw indicates that this contention must fail. In *Pellaton v. The Bank of New York*, the Delaware Supreme Court held as follows with respect to the effect of a party's failure to read the terms of a contract:

> "If ... [Pellaton's] argument [was] followed to its logical extreme, ... a contracting party could radically redefine his [contract] simply by proving that he had not been informed as to its stated terms." *Graham v. State Farm Mut. Auto. Ins. Co.*, Del. Supr., 565 A.2d 908, 912 (1989). However, "a party to a contract cannot silently accept its benefits, and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance." *Id.* at 913. (citations omitted) As the United States Supreme Court stated more than one hundred years ago:
>
>> That ... [Pellaton] did not read the [loan documents], if such were the fact, was his own fault. It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the

words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.

> *Upton, Assignee v. Tribilcock*, 91 U.S. 45, 50, 23 L.Ed. 203 (1875) (citations omitted).

592 A.2d 473, 477 (1991) (quotations and brackets in original).

The *Pellaton* court further noted that "[o]ther jurisdictions have similarly held that a person signing a contract, having the capacity and the opportunity to read its contents, cannot avoid the contract on the ground that he/she signed the contract without reading it." *Pellaton*, 592 A.2d at 476–77 n. 6. Therefore, Pettinaro's contention that it is not bound by the release term because Durnan failed to read and appreciate the nature of the agreement to which he was binding his employer is unpersuasive.

█ Pettinaro persuasively contends, however, that under applicable Delaware caselaw, a contractual indemnity provision such as the one at bar will·not be given effect to indemnify a party from liability in matters resulting from that party's own negligence unless the contract contains language clearly and unequivocally specifying that the protected party is to be indemnified for damages and expenses arising from its own negligence. (D.I. 100 at ¶¶ 22–25 (citing, *inter alia, Paoli v. Dave Hall, Inc.*, 462 A.2d 1094, 1098 (1983)). Pettinaro also persuasively argues that the indemnity provision at issue here contains no such language and that Active thus should not be indemnified for losses and expenses arising from its own negligence. (D.I. 100 at ¶¶ 26–28). Moreover, Pettinaro filed a supplemental memorandum of law arguing with considerable force that 6 Del.C. § 2704(a) voids the exculpatory clause at issue here insofar as it seeks to exculpate Active of any liability arising from its own negligence.[7]

---

6. At oral argument held before this Court on March 23, 1993, Pettinaro made it clear that, as a factual matter, it takes the position that Durnan did not read the "RENTAL AGREEMENT" documents prior to signing them.

7. The Court rejects Pettinaro's argument, however, insofar as Pettinaro contends that Active cannot recover counsel fees because they "do not fall within the express or implied terms of the contract." (*See* D.I. 100 at ¶ 28–29). As noted above, the release provision expressly provides that the lessee, here Pettinaro, "agrees to defend lessor from all suits resulting from ·... operation" of the leased cranes. Therefore, to the extent that the suit against Active arises from "operation" of the cranes, and in the event that Active is found to be free of negligence (direct or

In response to these arguments, Active "concede[s] that the language in the contract is insufficient to hold the operators Dooling and Karr harmless for their own negligence, if any, in the operation of the cranes." (D.I. 117 at ¶ 5). Likewise, Active does not contend that the indemnity provision provides Active itself with indemnification for losses and defense costs arising from Active's own negligence. (*See* D.I. 117). Rather, Active seeks to rebut the obvious force of Pettinaro's argument regarding Active's ability to receive indemnity for expenses and losses arising from its own negligence by contending that "there is no act on the part of Active Crane which has been alleged to be negligent." (D.I. 117 at ¶ 5). Similarly, Active asserts that "there is no factual basis for a finding of negligence on behalf of Active." (D.I. 117 at ¶ 5). Active's argument here essentially is that Active: (1) cannot be held vicariously liable for the negligent acts, if any, of crane operators Dooling and Karr (D.I. 117 at ¶¶ 7–10); (2) was not negligent in retaining these professionals for the subject work (D.I. 117 at ¶ 6); (3) was not negligent in supplying the equipment requested by Pettinaro (*see* D.I. 117 at ¶ 1); and (4) in the absence of proof refuting or raising a genuine issue of fact regarding these three assertions, there is no basis for a negligence finding against Active. (*See* D.I. 117 at ¶ 5).

■ Active contends that under applicable Delaware authorities regarding the Borrowed Servant Doctrine, Pettinaro, rather than Active, will be held vicariously liable for any negligent acts committed by Dooling and Karr in connection with this crane mishap. (D.I. 117 at ¶ 7 (citing *Richardson v. John T. Hardy & Sons, Inc.*, 182 A.2d 901 (Del. Supr.1962)). Under this doctrine, an employee who is loaned by his general employer to another to perform specific services may become the employee of that other while performing the specific services. Active correctly contends that application of this doctrine and determination of which employer is to be held vicariously liable under these circumstances will turn on which employer had

the right to direct and control the employees' acts which caused Middletown's property damages.

■ In support of its contention that Pettinaro, rather than Active, should incur any *respondeat superior* liability stemming from any negligence of Dooling and Karr in connection with this crane accident, Active sets forth evidence purportedly showing that: (1) operators Dooling and Karr "were not ... employees of Active Crane [b]ut work out of Union Local 547" (D.I. 117 at ¶ 8); (2) the equipment rental contracts specifically provided that Active agrees "to supply [the cranes] and necessary personnel to operate same under direct and sole supervision of" Pettinaro (D.I. 117 at ¶ 8; D.I. 90, Exhibit A); and (3) the crane operators, Dooling and Karr, in fact acted under the direction and control of Pettinaro at the time this accident occurred (D.I. 117 at ¶¶ 3–4).

The Court rejects this argument because there clearly is a genuine issue of material fact regarding the status of crane operators Dooling and Karr. The record raises a question of fact as to whether Dooling and Karr were independent contractors, employees of Active, employees of Pettinaro, or had a "duality of employment" with respect to Active and Pettinaro. There is Delaware legal authority indicating that a jury properly could conclude that Dooling and Karr were Active's employees under the circumstances present here. *E.I. du Pont de Nemours & Co. v. I.D. Griffith, Inc.*, 130 A.2d 783 (Del.1957); *Barnes v. Towlson*, 405 A.2d 137 (Del.Super.1977); *Loden v. Getty Oil Co.*, 316 A.2d 214 (Del.Super.1974); *Desimone v. Pusey*, No. 89C–OC–22, Order, 1991 WL 215750, 1991 Del.Super. LEXIS 354 (Del.Super.1991); *Jackson v. Tyndall*, C.A. No. 83C–MY–18, slip op., 1986 WL 7997, Del.Super. LEXIS (Del.Super.1986). Other Delaware cases indicate that Dooling and Karr properly could be found to have become Pettinaro's borrowed servants. *Brittingham v. American Dredging Co.*, 262 A.2d 255 (Del. 1970); *Richardson v. John T. Hardy & Sons, Inc.*, 182 A.2d 901 (Del.1962); *Paoli v. Dave*

vicarious) in connection with this action, Pettinaro may have some contractual obligation to in-

demnify Active for its litigation costs.

*Hall, Inc.*, 462 A.2d at 1096–98; *Loden v. Getty Oil Co.*, 316 A.2d 214; *Wilson v. Nooter Corp.*, 475 F.2d 497, 499–502 (1st Cir. 1973). Under these circumstances, and since status questions such as the one presented here almost always present a question of fact for jury determination, the Court finds that the issue of whether Dooling and Karr were independent contractors, employees of Active, employees of Pettinaro, or had a "duality of employment" with respect to Active and Pettinaro must remain for resolution by the jury.

■ As to the question of whether Active Crane could be held liable under a theory of negligent hiring, the Court finds that there is a genuine issue of material fact which prevents summary disposition of this claim as well. Plaintiff and Pettinaro present two factual theories in support of this claim. First, they contend that certain statements made by defendant Karr on the day of the crane accident indicate that defendant Dooling was an untrustworthy crane operator. The Court rejects this contention because the record does not indicate that Active had actual or constructive knowledge regarding any such allegation. The second theory for negligent hiring set forth by Hartford and Pettinaro is that Active was negligent in retaining Dooling to operate a thirty-ton crane because Dooling himself concedes that he had little or no experience operating a crane of that size. Active attempts to rebut this contention by pointing to Dooling's own self-serving testimony to the effect that there is no material difference in the operation of the thirty-ton crane involved in this accident and other similar cranes with which Dooling apparently had considerable experience. Although plaintiff and Pettinaro have failed to produce any evidence rebutting Dooling's factual assertion in this regard, the Court finds it is inappropriate to grant summary judgment on this claim solely on the basis on Dooling's self-serving deposition testimony, particularly since Active first raised this factual assertion in its reply memorandum and since expert discovery apparently is still ongoing in this case. In the event that plaintiff, Pettinaro or another party fails to present evidence at trial raising a genuine issue of material fact as to this claim, then the Court will enter a directed verdict in Active's favor with respect thereto.

■ The final question regarding Active's summary judgment motion is whether there is evidence raising a genuine issue of material fact as to whether Active was directly negligent in its handling of this crane rental transaction. It is clear that Active Crane had a duty to conduct itself as a reasonable heavy equipment lessor in connection with this transaction. The record makes clear that, depending on the circumstances of the particular transaction, Active involves itself to some degree in issues of crane selection and placement in assisting its customers with performance of a safe lift. (*See* D.I. 169, Exhibit A at 41–42). The record also reveals that Active was presented with certain information regarding the weight of the load to be lifted in connection with the Middletown lift of January 16, 1990, and that Active to some extent determined that the cranes which it leased to Pettinaro would be sufficient for the Middletown lift.[8] Whether Active conducted itself as a reasonable heavy equipment lessor in this regard is a question of fact which cannot be resolved on summary judgment, particularly since it appears that expert testimony may be necessary to ascertain how a reasonable crane lessor would have conducted itself in the circumstances at issue here. Accordingly, Active's motion for summary judgment will be denied as to this claim as well.

For these reasons, the Court will deny Active's motion for summary judgment as to

8. It appears that there was some form of miscommunication between Pettinaro's employee McCormick and Active's employee Schmeusser. In particular, McCormick alleges that he stated that *each* crane would be required to lift 20,000 pounds (D.I. 169,. Exhibit B at 79 1. 8–10), whereas Schmeusser alleges he was told that a *total* of 20,000 pounds was to be lifted by *both* cranes together. (D.I. 170, Exhibit F at 15). Assuming that McCormick accurately conveyed to Schmeusser that each crane was to lift approximately 20,000 pounds, which obviously is a question of fact which cannot be resolved by this Court, then Schmeusser arguably could be found negligent for failing to inform McCormick that the requested cranes were insufficient to lift a load of 40,000 pounds.

plaintiff's claim against it. With respect to Active's summary judgment motion on its cross-claim against Pettinaro, the Court will grant the motion only insofar as finding, as a matter of law, that Pettinaro is bound by the terms of the release provision contained in the leases signed by Durnan, Pettinaro's employee, but that the release provision does not provide indemnity or defense protection for liability and defense costs arising from Active's own negligence.[9] Active's motion on its cross-claim will be denied in all other respects.

*Karr's Summary Judgment Motion*

Karr moves for summary judgment on the ground that the record contains no evidence upon which he could be found negligent.

■ The Court will deny the motion because there is evidence in the record indicating that Karr knew or should have known that the hoist system weighed substantially more than 20,000 pounds and that the cranes at the lift site were insufficient to perform the lift. Given Karr's experience and expertise, the Court finds that a jury could conclude that Karr was negligent in failing to abort the lift when he realized or should have realized, as a reasonably prudent and careful crane operator, that the cranes were unable to perform the lift and that performing the lift would be unsafe.

*Motions for Summary Judgment by Rekers and Hydrotile*

Rekers and Hydrotile move for summary judgment on the ground that they had no duty in connection with the lift that led to this crane accident and that even if they had some duty with respect thereto, there is no evidence upon which a reasonable jury could conclude that the duty was breached.

As an initial matter, the Court finds that the crane lift of an object weighing approximately 50,000 pounds is an inherently dangerous activity and that parties involved in such an activity must exercise the care and caution appropriate to the circumstances.

As to whether the law imposed a duty on Hydrotile and Rekers in regard to this matter, it is clear that there was such a duty and that their duty was to conduct themselves as reasonable sellers/installers of a 50,000 pound system. As explained by the Delaware Supreme Court,

> Delaware law measure duties owed in terms of reasonableness. One's duty is to act reasonably, as a reasonably prudent man (or entity) would. *Robelen Piano Co. v. DiFonzo*, Del.Supr., 169 A.2d 240, 244 (1961); *State v. Arnold*, Del. O. & T., 27 A.2d 81, 83 (1942); *McKinney v. Reardon*, Del.Super., 337 A.2d 514, 515 (1975). One breaches that duty by not protecting against an event that a reasonably prudent man would protect against. Stated differently, one's duty encompasses protecting against reasonably foreseeable events. *See State v. Clark*, Del.Supr., 20 A.2d 127, 129–30 (1941); *Cannon v. Delaware Electric Power Co.*, Del.Super., 24 A.2d 325 (1941).

*Delmarva Power & Light Co. v. Burrows*, 435 A.2d 716 (Del.Supr.1981); *see also Taylor v. Cook*, Civil Action No. 88C–JN29, 1991 WL 35681, 1991 Del.Super. LEXIS 66 (Del.Super.1991); *National Fire Ins. Co. of Hartford v. Westgate Construction Co.*, 227 F.Supp. 835 (D.Del.1964).

■ The discovery record contains evidence upon which a jury could conclude that both Rekers and Hydrotile were negligent by failing to provide accurate weight information with respect to the hoist system, by acquiescing in selection of cranes which clearly were insufficient to perform the hoist system lift and by failing to take appropriate action to ensure that the lift was performed safely. (*See* D.I. 182 at 6–9; D.I. 181 at 6–13; D.I. 180 at 4–7). The extent to which Rekers and Hydrotile were obligated to perform these duties and the issue of how a reasonable seller/installer of a 50,000 pound system would have conducted itself under these circumstances are issues that apparently will have to be addressed by expert testi-

---

9. It thus appears that the issue of the release provision's legal effect largely, if not entirely, is resolved and that nothing remains for jury determination regarding this matter. Of course, the parties are free to introduce the rental agreements into evidence at trial for appropriate purposes.

mony at trial. Accordingly, the Court will deny these motions for summary judgment.

### Conclusion

For the foregoing reasons, the Court will deny the motions of defendants Karr, Active, Rekers and Hydrotile for summary judgment as to the claims of plaintiff against them. As to Active's motion for summary judgment on its cross-claim against Pettinaro, the Court will grant the motion only insofar as finding as a matter of law that Pettinaro is bound by the terms of the release provision contained in the lease agreements signed by its employee Durnan; Pettinaro, however, has no duty under the release with respect to matters arising from Active's own negligence. An Order consistent with this Memorandum Opinion shall issue.