**Shirley E. LODEN, Administratrix of the Estate of Carlton L. Loden, Jr., Deceased, et al., Plaintiff,**

v.

**GETTY OIL COMPANY et al., Defendants.**

Superior Court of Delaware,
New Castle.

Feb. 8, 1974.

**215**

F. Alton Tybout, of Tybout, Redfearn & Schnee, Wilmington, for plaintiff.

Alfred M. Isaacs, of Flanzer & Isaacs, Wilmington, for defendant.

TAYLOR, Judge.

Plaintiff, administratrix of the estate of Carlton L. Loden, Jr. [deceased] seeks to recover against Getty Oil Company [Getty] for serious injuries which deceased suffered while working at the site of the Getty refinery near Delaware City on April 10, 1972 when the cutting torch which deceased was using to cut a pipe fitting ignited oil which was in the pipe. Deceased was hired and paid by Catalytic Construction Company [Catalytic]. Getty has moved for summary judgment on the ground that deceased was an employee of Getty at the time of the accident, and therefore, this action is barred by 19 Delaware Code § 2304 of the Delaware Workmen's Compensation Law. Plaintiff seeks summary judgment on the converse of that issue.

It is necessary to review the relationship between Catalytic and Getty, deceased and Getty, and deceased and Catalytic in considering the merits of Getty's motion.

For many years, a contractual relationship has existed between Catalytic and Getty whereby Catalytic has undertaken to perform various work, mostly in maintenance and construction, at the Getty refinery. There is no significant common ownership in the corporations of Catalytic and Getty. There are no common members of the Board of Directors or officers of Catalytic and Getty. The contract pursuant to which Catalytic has performed services for Getty at the Delaware City refinery was negotiated as an arm's length transaction.

The number of workmen provided by Catalytic for work at the Getty refinery has varied between two hundred and in excess of one thousand, mostly skilled, such as iron workers, pipe fitters, craft foremen, area supervisors, and engineers.

The following facts descriptive of deceased's working relationship are undisputed:

1. Catalytic hired the deceased at the time of his employment preceding his accident.

2. Deceased was paid by Catalytic checks.

3. Getty did not exercise control over the selection of persons employed by Catalytic, but Getty has recommended discharge by Catalytic of any employees not measuring up to standards.

4. Getty kept no records of and exercised no control over the presence or absence on any specific work day of individual members of the various crafts working on the Catalytic payroll at the Getty plant.

5. Getty did not report to its workmen's compensation carrier as such the accident involving the deceased as involving a Getty employee.

6. The workmen's compensation carrier for Catalytic paid all medical expenses of the deceased, all workmen's compensation payments and entered into all agreements with the deceased or his survivor.

7. Getty's compensation carrier made no payments to the deceased under the Workmen's Compensation Law.

8. Getty did not report the deceased's accident to the Industrial Accident Board as an industrial accident involving its employee.

9. Getty's accident reports, investigations concerning the accident, designated the deceased as an employee of Catalytic.

10. No one in the Getty organization gave the deceased any instructions as to what to do in the course of his work or how to do it.

11. The deceased received his instructions as to the work to be performed from his foreman, Jesse Wooleyhan, who was an employee of Catalytic. Jesse Wolleyhan in turn received his instructions from another Catalytic employee, Mr. Lindamood.

Getty contends that deceased was its employee and, therefore, deceased is barred by virtue of 19 Del.C. § 2304 from bringing this action against Getty. § 2304 precludes recovery by an employee against his employer except workmen's compensation. The issue, therefore, is whether, notwithstanding deceased's relationship to Catalytic, deceased was an employee of Getty within the meaning of the Workmen's Compensation Law.

19 Delaware Code § 2311 provides:

"No contractor or sub-contractor shall receive compensation under this chapter, but shall be deemed to be an employer, and all rights of compensation of the employees of any such contractor or sub-contractor, shall be against their employer and not against any other employer."

Although the above-quoted language indicates a legislative purpose to avoid or at least minimize multi-employer situations under the Workmen's Compensation Law, it does not totally exclude their possibility.

Under Delaware law there may be the situation of the workman who is the employee of successive or intermittent employers, as in Gooden v. Mitchell, Del. Super., 2 Terry 301, 21 A.2d 197 (1941). There may also be the situation of the borrowed employee, as in Berg v. Happy Hill Farm, Del.Super., No. 5227 C.A. 1972, Opinion January 9, 1973, Tease, J., aff'd

Del.Supr., No. 19, 1973, Order April 30, 1973; Cf. Faircloth v. Rash, Del.Supr., — A.2d —, Opinion January 21, 1974.

Whether and to what extent there may be a joint employment or a dual employment which might result in multiple or shared workmen's compensation liability with corresponding immunity from tort claim by virtue of the Delaware Workmen's Compensation Law has not been the subject of decision in this State. 1A Larson, Workmen's Compensation Law 839, § 48.40, recognizes the general validity of both types of employment under proper fact situations, but notes the existence of special statutory provisions in certain states including the State of Delaware.

Plaintiff does not contend that under Delaware law there cannot be joint employment. However, plaintiff asserts that the facts of this case do not establish joint employment.

The Delaware Supreme Court has held that the question of whether an employee-employer relationship exists for purposes of the Workmen's Compensation Law is governed by the same tests applied by the general law. Lester C. Newton Trucking Company v. Neal, Del.Supr., 204 A.2d 393 (1964). Ordinarily, there are four elements which are considered in determining whether such relationship exists, namely, (1) who hired the employee, (2) who may discharge the employee, (3) who pays the employee's wages, and (4) who has the power to control the conduct of the employee when he is performing the particular job in question. Ibid. Of these factors, the one which has been given greatest weight is the power to control and direct the activities of the employee in the performance of the act which caused the injury. Ibid; Richardson v. John T. Hardy and Sons, Inc., Del.Supr., 4 Storey 567, 182 A.2d 901 (1962); Brittingham v. American Dredging Company, Del.Supr., 262 A.2d 255 (1970).

In order to constitute an employer-employee relationship, the control must be

more than merely pointing out the area where the operator is to work and the results which he is to accomplish. Brittingham v. American Dredging Company, supra.

In determining the true relationship between Getty and the deceased, it is significant to examine the contractual relationship existing between Getty and Catalytic. Weiss v. Security Storage Company, Del. Super., 272 A.2d 111 (1970). While the formal contract between the parties may not indicate the relationship which existed in actual practice between the parties, and in a situation such as this is not conclusive of the issue, Cf. Chaiken v. Employment Security Commission, Del.Super., 274 A.2d 707 (1971), it should be examined and given its proper weight.

With respect to the relationship between Getty and Catalytic, the contract provided that Catalytic "shall be deemed to be an independent contractor". With respect to work to be performed under the contract, it provided that Catalytic would employ all labor, including foremen, necessary to carry out the work. The contract provided that the persons so employed by Catalytic would be carried on Catalytic's payroll and that Catalytic would pay and withhold all contributions and taxes imposed by law, unemployment insurance, income taxes "and compensation payable by Catalytic in connection with said work". It further provided that all persons employed by Catalytic in connection with the work "shall be Catalytic employees". Finally, it provided that persons employed by Catalytic "shall be under its complete and sole control and supervision".

In contrast to the contract characterizations, Getty points out that Catalytic is doing much of the maintenance work at the Getty refinery, that the work is done on Getty premises with Getty tools, that Catalytic's work is an integral part of Get-

ty's entire operation without which Getty could not operate its refinery, that Getty pays all of Catalytic's expenses plus a percentage override, which expenses include all wages and salaries paid by Catalytic for work at the Getty refinery, including taxes, unemployment insurance, workmen's compensation insurance and bodily injury and property damage insurance, and that in practice Getty does the bookkeeping and accounting work for Catalytic's payroll and prepares checks given to Catalytic's employees. Catalytic is required to have Getty named as an additional insured on Catalytic's workmen's compensation policy and on its all risk and legal liability property damage policy.

It appears that a clear distinction was made in the organizational setup between Getty's organization and Catalytic's organization, each having its own supervisory hierarchy. It appears that the decision of what work was to be performed was made by Getty supervisory personnel. In some instances the details of the work were developed by the joint efforts of Getty and Catalytic engineers. The work assignment was passed on to the supervisory personnel of Catalytic and from there transmitted down the supervisory organization to the craftsmen of Catalytic. Deceased's supervisor was a Catalytic field supervisor. In each zone of the refinery there was a Catalytic supervisor who was directly responsible for work done by Catalytic craftsmen, and he in turn was responsible to a Catalytic supervisor.

While it is not binding in this case, the case of Balma v. Tidewater Oil Company, Del.Supr., 214 A.2d 560 (1965) is illuminating in that it also involved an employee of Catalytic who worked at the Getty (then Tidewater) refinery under the contractual arrangement between Catalytic and Tidewater (now Getty).[1] Balma, the injured Catalytic employee, sought to hold Tidewater liable under 16 Del.C. § 7701(a)

---

1. It is noted that in the instant case, the contract upon which the parties rely is a contract between Tidewater Oil Company and Catalytic dated April 7, 1959, effective July 31, 1956.

which forbade anyone "employing or directing another to perform labor" providing unsafe scaffolding or ladders. Tidewater resisted, inter alia, on the ground that Balma was not employed by Tidewater. The Delaware Supreme Court held that the evidence failed to show that Tidewater employed Balma or that Tidewater had any connection with the assignment or supervision of Balma's work. The relationship in *Balma* is not described in sufficient detail to permit this Court to determine to what extent, if any, the practices under the Catalytic-Tidewater contract have changed since *Balma*.

Getty contends that since it controlled the nature of the work and the quality of the performance, that this control was sufficient to constitute the deceased as an employee of Getty. This contention overlooks the fact that the direct control over the Catalytic employees was exercised by Catalytic field supervisors. Thus the ultimate control over the work remained with Getty while the control over the employees, including the assignment of specific work to a specific employee and the control over the detailed performance of the work, remained with Catalytic.

Deceased was not performing work partly for Catalytic and partly for Getty. It was all done pursuant to the contract between Catalytic and Getty. Nor was he sometimes performing Catalytic work and sometimes performing Getty work. The work was of the one general type, namely, repair or reconstruction of the Getty plant. Compare 1A Larson, Workmen's Compensation Law 836–51, §§ 48.40 & 48.50. Nor does the work at the Getty refinery qualify as a joint venture, since the objective was the continued operation of Getty's refinery. Ibid, p. 840, § 48.40. Finally, the conditions of deceased's employment were not such that a contract of employment between Getty and deceased can fairly be implied. Ibid, pp. 843–4, § 48.40.

Getty contends that it exercised control over deceased in that it controlled the work schedules and amount of work to be done. This emphasizes the distinction between general control and the specific control over an individual workman required to constitute employment. The control which Getty relies upon is its control over Catalytic, but it does not establish the necessary control over Catalytic's employees. Richardson v. John T. Hardy and Sons, Inc., supra; Brittingham v. American Dredging Company, supra. In addition, Catalytic hired deceased, it had the power to discharge him, and it paid his wages. All of the elements enumerated in Lester C. Newton Trucking Company v. Neal, supra, established that deceased was the employee of Catalytic and was not the employee of Getty.

At the argument the parties agreed that the matter before the Court should be treated as a motion by plaintiff as well as by Getty for summary judgment. The parties do not contend that summary judgment on this issue is unavailable because of a genuine issue as to any material fact. It is in order that the Court dispose of the issue of whether the relationship between deceased and Getty was such as to bar this action because of the Workmen's Compensation Law.

■ The Court finds that deceased was not an employee of Getty and that this action is not barred by the Workmen's Compensation Law. Accordingly, Getty's motion for summary judgment is denied, and plaintiff's motion for summary judgment on the limited issue discussed herein will be granted upon the filing of a proper motion and order.