**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| SHAWANA LAYNE (f/k/a Shawna Singleton) | ) | |
| as Guardian Ad Litem and Next Friend to | ) | |
| FRANK LAYNE, JR., | ) | |
| | ) | C.A. No. N12C-12-057 EMD |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GAVILON GRAIN, LLC, et. al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: June 29, 2015
Decided: July 10, 2015

*Upon Consideration of the*
*Motion for Summary Judgment of Defendants, Gavilon Grain LLC and Hector Cabrera*
***GRANTED***

Jeffrey M. Gentilotti, Esquire, David A. Denham, Esquire, Bifferato and Gentilotti LLC, Newark, Delaware, *Attorneys for Plaintiff Shawana Layne (f/k/a Shawna Singleton) as guardian ad litem and next friend to Frank Layne, Jr.*

Robert G. Devine, Esquire, Michael W. Horner, Esquire, Rochelle L. Gumapac, Esquire, White and Williams LLP, Wilmington, Delaware, *Attorneys for Defendants Gavilon Grain, LLC and Hector Cabrera.*

**DAVIS, J.**

## I.    INTRODUCTION AND PROCEDURAL HISTORY

This is a negligence action brought by Plaintiff Shawana Layne (f/k/a Shawna Singleton) as guardian *ad litem* and next friend to Frank Layne, Jr.   This matter arises from a November 10, 2011, work place accident which caused injury to Mr. Layne and Defendant, Jair "Hector" Cabrera.   The accident took place at a facility operated by Defendant Gavilon Grain LLC

("Gavilon"). Access Labor Services, Inc. ("Access") had assigned Mr. Layne as a general laborer to Gavilon's facility. Several lawsuits arose from that accident, including the instant action wherein Mr. Layne[1] filed suit against several parties, including Gavilon, Mr. Cabrera, MSP Equipment Rentals, Inc., ("MSP") and Terex Corporation which was subsequently substituted with Genie Industries, Inc. ("Genie").

As to Gavilon, Mr. Layne claims that he was an employee of Access, and makes claims of negligence, agency and *respondeat superior*, and negligent entrustment. With respect to Mr. Cabrera, Mr. Layne claims that Mr. Cabrera, while acting as an agent, servant and/or employee of Gavilon, operated equipment in a negligent, careless and reckless manner. In addition to general and special damages, Mr. Layne also seeks punitive damages.

On September 19, 2014, Gavilon filed the Motion for Summary Judgment of Defendants, Gavilon Grain LLC and Hector Cabrera (the "Motion"). On October 3, 2014, Mr. Layne filed the Plaintiff's Response to Defendants Gavilon Grain LLC and Jair Cabrera's Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment.

On October 3, 2014, defendant Genie filed Defendant Genie Industries, Inc.'s Response in Opposition to the Motion for Summary Judgment of Defendants Gavilon Grain LLC and Jair Cabrera. Also on October 3, 2014, MSP filed its Defendant MSP Equipment Rental, Inc.'s Response to Motion for Summary Judgment of Defendants Gavilon Grain, LLC and Hector Cabrera.

On October 17, 2014, Gavilon and Mr. Cabrera filed the Reply Brief of Defendants Gavilon Grain LLC and Hector Cabrera to the Opposition of Plaintiff Shawna Layne, as guardian *ad litem* and next friend to Frank Layne Jr. to their Motion for Summary Judgment.

---

[1] For purposes of this Opinion, the Court will use Mr. Layne as the plaintiff. The Court understands that Ms. Layne is bringing this negligence action against the various defendants as guardian *ad litem* and next friend.

The same day Gavilon and Mr. Cabrera also filed the Reply of Defendants Gavilon Grain LLC and Hector Cabrera to the Opposition of Defendant Genie Industries, Inc. to their Motion for Summary Judgment and the Reply Brief of Defendants Gavilon Grain LLC and Hector Cabrera to the Opposition of Defendant MSP Equipment Rental, Inc. to their Motion for Summary Judgment.

The Court held a hearing on the motions and cross motions on March 16, 2015. All parties appeared and presented arguments in support of their respective positions. Moreover, the parties seemed to agree that the issue of whether Mr. Layne was a "borrowed servant" or not was ripe for adjudication by the Court. After the hearing, the Court reserved its decision.

Subsequently, on May 29, 2015, Mr. Layne's counsel completed a second deposition of James Engler, the facility manager for Gavilon. After the deposition, Mr. Layne immediately requested that the Court refrain from issuing any formal ruling on the pending dispositive motions so that the parties could supplement the record. The Court held a hearing on June 22, 2015, and granted the parties leave to file supplemental briefing. On June 25, 2015, Mr. Layne filed the Supplemental Brief in Support of Plaintiff's Response to Defendants Gavilon Grain LLC and Jair Cabrera's Motion for Summary Judgment and Cross Motion for Summary Judgment. On June 29, 2014, Gavilon filed the Reply Brief of Defendants Gavilon Grain LLC and Hector Cabrera to the Supplemental Opposition Brief of Plaintiff Shawna Layne, as guardian *ad litem* and next friend to Frank Layne Jr. to their Motion for Summary Judgment.

The Court has reviewed all the pleadings in this matter, as well as the deposition transcripts of Mr. Layne, Access employee Dennis Yetman, and Mr. Engler's two depositions. For the reasons set forth below, the Motion for Summary Judgment of Defendants, Gavilon Grain LLC and Hector Cabrera is **GRANTED**.

## II.    FACTUAL BACKGROUND

On August 31, 2009, Mr. Layne completed a Pre-Applicant Job Questionnaire and an Employment Application with Access.[2]  As part of the Employment Application, Mr. Layne also completed a W4 form and executed the Substance Abuse Policy.[3]  Access has the power to terminate an employee if it finds a violation of the Substance Abuse Policy.[4]  All Access employees must complete and execute Access' Policies and Procedures checklist.  Paragraph 6 of that checklist provides: "I understand that I am an employee of this staffing company and only this staffing company…"[5]  An Access employee is required to report any absence or late arrivals at work to Access.[6]

Mr. Layne was interviewed by Access, hired, and subsequently placed as a general laborer with Gavilon.  Access did not expect general laborers to ride on boom lifts, and expected Gavilon and Mr. Layne to contact Access before it directed a general laborer onto a boom lift.[7]  This is supported by the Client Safety Partnership Letter executed between Gavilon and Access which stated "Our employees will only work on jobs for which they have been assigned and trained.  Any variance must be reported to our office before work begins."[8]

The Contract between Access and Gavilon has the following clauses:

> ACCESS LABOR SERVICES takes care of our worker's Federal, Delaware State & Delaware Local taxes, as well as FICA, Unemployment, Worker's Comp. and General Liability Insurance. We bill you weekly and payment is due net ten days from the date of the invoice.

---

[2] Exhibit 2, Dennis Yetman Deposition, March 25, 2014 ("Yetman Dep.").
[3] *Id*.
[4] Yetman Dep. 18:5-21.
[5] Exhibit 2, Yetman Dep.
[6] Yetman Dep. 23:7-18.
[7] *Id*. 120:2-15.
[8] Exhibit 3, Yetman Dep.

4

…

Terms and Conditions

2 … Client also agrees not to authorize employee to operate or drive a motorized vehicle or operate any machinery without prior written approval from ACCESS LABOR SERVICE. ACCESS LABOR SERVICE will not be responsible for any loss arising from those practices.

3. … Any employee placed with your company by ACCESS LABOR SERVICE is an employee of ACCESS LABOR SERVICE and may not be hired by client within one year of the last day worked for ACCESS LABOR …[9]

In conformity with the contract, Access maintains worker's compensation insurance for its employees, as well as unemployment insurance, FICA, and general liability insurance.[10] Access deducts taxes from the compensation it pays to its employees.[11]

Access charged Gavilon $17 per hour for general laborers.[12] Mr. Layne was a general laborer.[13] Gavilon paid for his services, and Access would pay Mr. Layne directly.[14] Access would appear at the Gavilon facility approximately once per month to observe Mr. Layne and other Access workers assigned to the facility.[15]

After being hired by Access, Access provided Mr. Layne with some training in the form of a basic safety course consisting of a safety video and test.[16] Question number 8 on the safety test asks "If your supervisor asks you to handle chemicals or equipment you have not been trained to use, you should …" Mr. Layne selected option (b) which read "tell your supervisor that you have not been trained to handle the chemicals or operate the equipment."[17] Mr.

---

[9] *Id.*
[10] Yetman Dep. 16:22-17:12.
[11] *Id.* 17:6-8.
[12] *Id.* 31:8.
[13] *Id.* 31:17-18.
[14] *Id.* 48:6-13.
[15] Frank Layne Jr. Deposition 37:2-8 ("Layne Dep.").
[16] Yetman Dep. 22:11-14.
[17] Exhibit 2, Yetman Dep.

Yetman, an office manager for Access, testified at his deposition that, for safety reasons, Access did not want its employees to perform something that they were not trained to handle.[18] Mr. Yetman stated that under such a circumstance the client "would call and say, can you send a certified person, and we'd renegotiate a contract or a rate."[19] It was Access' understanding that under the contract documents with Gavilon, Access had the power to prohibit Gavilon from using an employee in an unauthorized way.[20]

Mr. Engler met and interviewed Mr. Layne on the first day that Mr. Layne was assigned by Access to Gavilon.[21] As noted above, Mr. Engler was Gavilon's facility manager. Mr. Engler conducted an interview and obtained information regarding Mr. Layne's background and skill set to ensure that Mr. Layne could perform the tasks that would be assigned.[22] Mr. Layne's interview was the same interview that Gavilon would have conducted of someone who was considered for full time employment.[23] Mr. Layne also completed an employment application with Gavilon.[24] The purpose of the application was for Gavilon to receive general information regarding Mr. Layne.[25] The application was suitable for Gavilon to eventually consider Mr. Layne for permanent employment with Gavilon.[26] However, Mr. Layne's application did not consist of the same forms that a full-time employee would fill out.[27]

During Mr. Layne's course of employment at the Gavilon facility, Gavilon directed Mr. Layne as to when he would work, when to take lunch, and when to take breaks.[28] Mr. Engler, as

---

[18] Yetman Dep. 26:8-13.
[19] *Id*. 26:17-27:1.
[20] *Id*. 27:15-20.
[21] James C. Engler Deposition, June 4, 2014, 137:8-138:3 ("Engler Dep.").
[22] Engler Dep. 31:18-32:4, 137:8-138:3.
[23] *Id*. 32:5-23.
[24] *Id*. 28:18-22; Exhibit 4, Engler Dep.
[25] Engler Dep. 28:23-29:2.
[26] *Id*. 29:3-10.
[27] *Id*. 29:14-19.
[28] Layne Dep. 38:2-39:14, 42:9-14, 85:6-86:3.

well as other senior Gavilon employees, directed Mr. Layne on what work to perform each day, and if need be, instructed Mr. Layne on how to perform the work.[29] Gavilon directly supervised Layne's day-to-day activities at the Gavilon facility.[30] Gavilon had the authority to discipline, fire or discharge Mr. Layne from his work at the Gavilon facility.[31] Gavilon had the authority to direct Mr. Layne to comply with all necessary work procedures and safety requirements for any particular work task Gavilon assigned to Mr. Layne.[32] Gavilon supplied Mr. Layne with all the necessary tools and equipment to perform his daily work activities.[33] Gavilon also provided or otherwise made available all necessary safety equipment and devices for Mr. Layne's assigned work tasks.[34]

Gavilon also decided when and if Mr. Layne would work overtime.[35] Mr. Layne had to contact Access when he worked overtime so that Access' records would be updated for that day, as Access charged more for employee overtime. However, Gavilon was the entity that decided whether Mr. Layne would work overtime.

Gavilon provided both written and on-the-job training to Mr. Layne at the time of his hire. Mr. Layne completed the following Gavilon-designed and presented training programs: (i) General Awareness level 1; (ii) General Awareness level 2; (iii) restricted access; (iv) hot work; (v) bin entry and (vi) lockout/tagout training.[36] Mr. Layne's training with Gavilon consisted of classroom instruction, written materials, and a video presentation which was followed by written question and answer tests.[37]

---

[29] *Id*. 42:18-43:8, 58:12-14; 86:12-87:3; 99:23-100:2.
[30] Engler Dep. 96:14-97:5; 138:4-6; Yetman Dep. 84:2-85:5.
[31] Yetman Dep. 87:7-19; Engler Dep. 161:7-11.
[32] Yetman Dep. 106:16-107:13; Engler Dep. 158:9-160:16.
[33] Engler Dep. 65:2-5; Layne Dep. 60:12-20 70:18-71:12.
[34] Engler Dep. 162:11-163:20.
[35] Layne Dep. 38:2-39:14, 42:9-14, 85:6-86:3.
[36] Engler Dep. 86:4-87:7 142:8-152:22.
[37] *Id*. 87:11-23; 142:8-152:22

7

Mr. Layne had been working at the Gavilon facility for approximately three months before the accident occurred.[38] At the time of the accident, Mr. Engler directed Mr. Layne to assist Mr. Cabrera with a welding and maintenance task. Gavilon supplied all the tools, safety devices, the articulating boom lift (occupied by Mr. Layne and Mr. Cabrera), the welding equipment and the safety lanyards.[39]

On the day of the accident, Mr. Engler had the authority to direct how Mr. Layne did his job, what tools to use, and whether or not Mr. Layne should be on a boom lift.[40] This was the same authority that Mr. Engler exercised over Mr. Layne since Mr. Layne began his work at the Gavilon facility. Mr. Engler's authority over Mr. Layne was so complete that Mr. Engler could direct Mr. Layne on which side of the silos to work, and whether to use a wrench or a socket wrench to remove bolts during the work.[41] Mr. Engler could also tell Mr. Layne and Mr. Cabrera exactly how to pass the materials from the basket of the lift onto the catwalk.[42]

Mr. Engler had the same authority over Mr. Cabrera, an employee of Gavilon.[43] The morning of the accident, Mr. Engler specifically told Mr. Layne and Mr. Cabrera at the toolbox meeting that Mr. Layne would be Mr. Cabrera's helper, and that Mr. Layne would be subject to Mr. Cabrera's direction.[44] Mr. Cabrera could direct Mr. Layne's activities within the scope of the project.[45]

[38] *Id*. 83:10-16
[39] *Id*. 127:11-128:8, 161:24-163:20, 167:14-168:19.
[40] James C. Engler Deposition Vol. 2, May 29, 2015, 522:14-23 ("Engler Dep. 2").
[41] *Id*. 526:3-11, 527:20-24
[42] *Id*. 528:5-9.
[43] *Id*. 523:12-17.
[44] *Id*. 524:3-24.
[45] *Id*.

The accident occurred when a Genie S-85 articulating boom lift occupied by Mr. Layne and Mr. Cabrera tipped over causing injuries to both Mr. Layne and Mr. Cabrera.[46] Due to the accident, Mr. Layne sustained severe physical injuries, which have left him permanently cognitively and physically disabled.

After the accident, Access personnel completed and filed the First Report of Occupational Injury.[47] Mr. Layne applied for and received worker's compensation benefits from Plaintiff through the worker's compensation insurance placed by Access. Gavilon contends that, in part, it funded this worker's compensation insurance.

### III.    PARTIES' CONTENTIONS

Gavilon and Mr. Cabrera contend that Mr. Layne is a special employee of Gavilon. As a special employee of Gavilon, Gavilon and Mr. Cabrera argue that Mr. Layne's claims against Gavilon and Mr. Cabrera, as well as the punitive damages claim, are barred by the exclusive remedy provision of Delaware's Workers' Compensation Act (the "Act"). Gavilon and Mr. Cabrera also contend that the exclusive remedy provision of the Act bars the cross-claims of co-defendants Genie and MSP.

Mr. Layne, Genie and MSP make substantially the same arguments in opposing the Motion. Mr. Layne, Genie and MSP all contend that Mr. Layne was an employee of Access and, therefore, the parties can proceed against Gavilon on various negligence and indemnification claims. For example, Mr. Layne contends that he was never a Gavilon employee and as such his claims are not barred by the exclusive remedy provision of the Act. Genie contends that Mr. Layne was an employee of Access, and not an employee of Gavilon. Lastly, MSP contends that, because Mr. Layne was an employee of Access, the exclusive remedy provision of the Act does

---

[46] Plaintiff's Complaint, ¶9.
[47] Yetman Dep. 6:7-16.

9

not apply to bar Mr. Layne's tort claims against Gavilon and Mr. Cabrera, or MSP's cross-claims against Gavilon and Mr. Cabrera.

## IV.    STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled. The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[48] Summary judgment will be granted if, after viewing the record in a light most favorable to a non-moving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[49] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[50] The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[51] If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[52]

## V.    DISCUSSION

### A.    Mr. Layne was a special employee of Gavilon.

The issues before the Court turn on whether or not Mr. Layne was a special employee, or a borrowed servant, of Gavilon. The common law borrowed servant doctrine focuses on the relationship between an employer and an employee. "The general rule is that an employee, with

---

[48] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. Ct. 1973).
[49] *Id.*
[50] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962). *See also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Ct. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates … that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").
[51] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).
[52] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

his consent, may be loaned by his general employer to another to perform specific services, and that, in the course of and for the purpose of performing such services, he may become the employee of the specific employer rather than the employee of the general employer. Accordingly, a loaned employee may become the specific employer's employee while at the same time remaining, generally speaking, the employee of the employer who loans his services."[53]

In *Lester C. Newtown Trucking Co. v. Neal*,[54] the Delaware Supreme Court set out a four part test that the courts should apply when determining whether a worker is an "employee" under the Act: (1) who hired the employee; (2) who may discharge the employee; (3) who pays the employee's wages; and (4) who has the power to control the conduct of the employee when he is performing the particular job in question.[55]  In *Porter v. Pathfinder Services, Inc.*, the Delaware Supreme Court subsequently used this test when determining that the Act barred the negligence claims of an employee – hired and paid by a placement agency but working for another temporary employer – against his temporary employer.[56]

As to the first element of the test, both Access and Gavilon hired Mr. Layne.  Mr. Layne completed a Pre-Application Job Questionnaire, an Employment Application and a W4 for Access.  Mr. Layne also completed an employment application with Gavilon.  Mr. Layne was interviewed by both Access and Gavilon.  Mr. Engler, who interviewed Mr. Layne, testified that Mr. Layne's interview with Gavilon was no different than what a full-time employee would have received.

---

[53] *Volair Contractors, Inc. v. AmQuip Corp.*, 829 A.2d 130, 134 (Del. 2003)
[54] *Lester C. Newtown Trucking Co. v. Neal*, 204 A.2d 393 (Del. 1964).
[55] *Id*. at 395.
[56] *Porter v. Pathfinder Serv., Inc.*, 683 A.2d 40, 42 (Del. 1996).

As to element two, both Access and Gavilon could discharge Mr. Layne.  Access reserved the right to terminate Mr. Layne, and, for example, made this fact clear in the Substance Abuse Policy.  Gavilon, however, retained the power to discipline, fire or discharge Mr. Layne from his work at the Gavilon facility.

As to the third element, Gavilon paid Mr. Layne through Access.  Access charged Gavilon $17 per hour for Mr. Layne's services, and more if Mr. Layne worked overtime.  The fact that Gavilon paid Access for Mr. Layne's work, instead of Mr. Layne directly is not dispositive of the four part test.

*Porter*, mentioned above, is most helpful here.[57]  In *Porter*, the defendant paid the placement agency and not the plaintiff for the plaintiff's services.[58]  The defendant paid 1.34 times the plaintiff's hourly rate.[59]  These facts did not preclude the Supreme Court from affirming the Superior Court's decision that the plaintiff was a special employee of the defendant.  Indeed, the Supreme Court noted that the hourly rate was used to cover the plaintiff's salary and mandatory employment charges such as worker's compensation.

In this case, Gavilon paid Access 1.7 times Mr. Layne's hourly rate.  The contract between Access and Gavilon states that Access

> …takes care of our worker's Federal, Delaware State & Delaware Local taxes, as well as FICA, Unemployment, Worker's Comp. and General Liability Insurance. We bill you weekly and payment is due net ten days from the date of the invoice.[60]

The plain reading of the contract shows that the surcharge goes towards Access' fee and mandatory employment charges including worker's compensation for Mr. Layne.

---

[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] Exhibit 3, Yetman Dep.

Finally, as to the fourth element, Gavilon had control over Mr. Layne. In a worker's compensation analysis, "[t]he greatest weight is given to the issue of control."[61] Gavilon directed Mr. Layne when to work, when to take lunch, and when to take breaks. Gavilon controlled how Mr. Layne did his work, as shown by the extensive training that it provided Mr. Layne. Gavilon also decided if Mr. Layne would work overtime. Access was not present at the facility, and only visited the facility approximately once a month. Gavilon determined each day which type of work Mr. Layne would be doing, and provided all the necessary tools and equipment. On the day of the accident, Mr. Engler told Mr. Layne at the toolbox meeting that Mr. Layne would be completing a welding and maintenance task under the supervision of Gavilon employee Mr. Cabrera. Mr. Cabrera then supervised and directed Mr. Layne in the completion of the task at the time of the accident. Clearly, it was Gavilon which had control over Mr. Layne's work at the facility on a day to day basis, including on the day of the accident.

Mr. Layne states several times in his motion papers that Mr. Layne had the power to refuse to get on the boom lift, because that exceeded the task expected of a general laborer, and that Gavilon was forbidden by the clauses of the contract to assign a general laborer to such a skilled task. Mr. Layne contends that since Mr. Layne was working on a task which was outside of the contract, Gavilon did not have control over Mr. Layne for that particular task. In the supplemental briefing, Mr. Layne contends that whether Mr. Layne or Mr. Cabrera was operating the lift at the time of the accident creates a significant issue of fact for the jury.[62]

---

[61] *Porter*, 683 A.2d at 42.

[62] Mr. Layne discusses, at length, in the supplemental briefing that Mr. Layne's work on the boom lift exceeded the scope of work designated under the contract between Access and Gavilon. That fact would not be determinative of whether Mr. Layne is a borrowed servant/employee of Gavilon. As the Restatement (Second) of Agency states:

Comment:
   d. *Where servant obeys temporary employer.* The servant may depart from the service of the general employer as to a given act either in accordance with the agreement between the general employer and the other, or in spite of it. The fact that he obeys the requests of the temporary employer as to the act does not

This is simply not the case. Whether it was Mr. Layne or Mr. Cabrera at the controls of the lift, it is clear from the records that Gavilon through its two employees, Mr. Engler and Mr. Cabrera directed the completion of the task, provided the supervision and the tools for the task. It is clear that Gavilon had control over Mr. Layne at the time of the accident. It was Gavilon that asked Mr. Layne to undertake work on the boom lift, Gavilon which supervised Mr. Layne, and told Mr. Layne how to conduct the task, and Gavilon which provided all the equipment. Access was not at the Gavilon facility at that time.

Mr. Layne relies on *Loden v. Getty*,[63] to refute that Mr. Layne was a special employee of Gavilon. However, in *Loden* the injured worker was supervised by a foreman of the agency which hired him.[64] Unlike in this case, where Gavilon supervised and directed all of Mr. Layne's work, in *Loden* the injured worker received all of his instructions as to which work he would perform, and instructions on how to perform his work from the foreman who worked for his employment agency.[65] The facility where the injured worker worked did not direct his work and could not discharge him from employment.[66] This case is plainly distinguishable from the current matter.

---

necessarily cause him to be the servant of such employer. *If, however, the temporary employer exercises such control over the conduct of the employee as would make the employee his servant were it not for his general employment, the employee as to such act becomes a servant of the temporary employer. If the employee does the very act directed by the temporary employer, the latter is responsible for having directed it, and the first employer is responsible as a master if the act is within the scope of his general employment.*

RESTATEMENT (SECOND) OF AGENCY § 227, cmt. d (emphasis added). While this comment is discussing theories relating to principal/agent and *respondeat superior* and injury to a third party, the point is that if Gavilon directed Mr. Layne to do work outside the scope of the agreement between Access and Gavilon, and Mr. Layne did such work then, under the Restatement (Second) of Agency, Mr. Layne would be deemed the employee of Gavilon and not Access.

[63]*Loden v. Getty*, 316 A.2d 214 (Del. Super. Ct. 1974).
[64] *Id.* at 216.
[65] *Id.*
[66] *Id.* at 215.

Mr. Layne also cites to the transcript of a pre-trial conference in *Morton v. Evraz Claymont Steel*[67] where the Court denied a summary judgment motion on a similar worker's compensation issue. The Court has reviewed the transcript of the *Morton* pre-trial conference, as well as the summary judgment motions filed by the parties in *Morton*. In *Morton* the Court found that there was a factual dispute as to whether or not the injured worker was an employee of the facility where he was placed by the employment. The employment agency had supervised the injured worker's work at the facility for months. While the employment agency was not supervising him at the time of the accident there had been a long history of supervision from the employment agency and not by the facility managers. In the present case, Access has no history of supervising Mr. Layne's work. Access would occasionally visit the Gavilon facility, but never directed Mr. Layne as to which work to perform or the manner in which he should perform his work. Therefore, unlike in *Morton* there is no issue of material fact in this case as to which party had control over Mr. Layne's work.

This is a straightforward case. Gavilon looked to Access for temporary employees. Access would provide the temporary employee to Gavilon at a hourly rate greater than the wage paid the temporary employee. Access would use the surcharge to cover its fee, the wage paid to the temporary employee and mandatory employment charges (FICA, workers compensation insurance, etc.). Once the temporary employee was placed at Gavilon, Access had little to no supervisory role over the temporary employee. Instead, Gavilon controlled and supervised the temporary worker on a daily basis. That is what happened with Mr. Layne, Access and Gavilon. Mr. Layne was employed by Access and became a temporary or special employee of Gavilon. Mr. Layne reported to Gavilon as instructed by Gavilon, stayed at work as long as Gavilon needed him to be there, and did work as directed by Gavilon or its agents. On the day of the

---

[67] *Morton v. Evraz Claymont Steel*, C.A. No. 09C-08-245 JRS (Del. Super. Ct. Dec. 21, 2011).

accident, Gavilon (through Mr. Engler and Mr. Cabrera) exercised control over the work that Mr. Layne performed and the way that work was to be performed. The Court finds that the facts here demonstrate that Gavilon was in control of Mr. Layne on the date of the accident, and that an employee-employer relationship existed between Gavilon and Mr. Layne. On that basis, the Court holds that the Act provides the sole remedy for Mr. Layne against Gavilon.[68]

**B.      Mr. Layne's claims against Gavilon and Mr. Cabrera are barred by the Exclusive Remedy of the Act.**

The Act provides that recovery under the Act is the exclusive remedy available to employees injured when acting in the course and scope of their employment. The Act states that "[e]very employer and employee … shall be bound by this chapter respectively to pay and to accept compensation for personal injuries or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies."[69] The Act also excludes co-employees from the category of persons who may be sued by an injured employee, and thus bars common law negligence suits against co-employees by fellow employees or by subrogated employees in connection with compensable injuries.[70]

Mr. Layne makes claims of negligence, agency and *respondeat superior*, and negligent entrustment against Gavilon, and claims that Mr. Cabrera, while acting as an agent, servant and/or employee of Gavilon, operated equipment in a negligent, careless and reckless manner. As Mr. Layne was a special employee of Gavilon, the Act provides the sole remedy for Mr. Layne's compensation for the injuries he suffered.

---

[68] *See Porter*, 683 A.2d at 42; *see also Six Flags Over Georgia v. Hill*, 276 S.E.2d 572, 574 (Ga. 1981) (concern is not over whether special employer always had control over special employee but, rather, whether special employer had complete control and direction only for the occasion at issue); RESTATEMENT (SECOND) OF AGENCY § 227 cmt. a.

[69] 19 *Del. Code* §2304.

[70] *Grabowski v. Mangler*, 956 A.2d 1217, 1220 (Del. 2008).

16

Moreover, the Act is the sole remedy for Mr. Layne despite his claim of recklessness against Mr. Cabrera. "The overwhelming weight of authority is that the common law liability of the employer cannot be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct short of genuine intentional injury."[71] Nothing short of a specific intent to injure the employee falls outside the scope of the Act.[72] Absent such specific intent, the employee is foreclosed from maintaining a tort action against a co-employee.[73] There is no evidence in this case that Mr. Cabrera acted with any intent to injure. As such, even the recklessness claims against Mr. Cabrera are barred by the exclusive remedy provision of the Act.

C. **Mr. Layne's claims for punitive damages are barred by the exclusive remedy of the Act.**

Mr. Layne's punitive damages claims are barred by the exclusive remedy of the Act, as such, Mr. Layne cannot receive any award of punitive damages for these claims. Moreover, an award of punitive damages cannot be made unless the plaintiff also receives compensatory damages, which Mr. Layne is plainly not eligible to receive.[74]

D. **The cross-claims of co-defendants Genie and MSP**

In their Answer and Amended Answer to Mr. Layne's Complaint, Genie and MSP assert cross-claims against Gavilon and Mr. Cabrera for contribution and indemnification. Where an employer has paid compensation benefits to an employee, the Act precludes imposition of joint tort liability upon the employer.[75] Section 2304 of the Act provides that payment of

---

[71] *Houston v. Bechtel Assocs. Prof'l Corp., D.C.*, 522 F. Supp. 1094, 1096 (D.D.C. 1981) (citing 2A Larson, Workmen's Compensation Law, s 68.13 at 13-5 and cases cited n.11 (1976)); *see also Eddy v. Virgin Islands Water and Power Auth.*, 369 F.3d 277, 234 (3d Cir. 2004).
[72] *Id.*
[73] *Id.*
[74] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).
[75] *Precision Air, Inc. v. Standard Chlorine of Del., Inc.,* 654 A.2d 403 (Del. 1995).

compensation to an injured employee of his representatives is exclusive and precludes the assertion of any other remedies against an employer.[76]

## IV. CONCLUSION

For the foregoing reasons the Motion for Summary Judgment of Defendants, Gavilon Grain LLC and Hector Cabrera is **GRANTED**.

**IT IS SO ORDERED.**

/s/ *Eric M. Davis*
Eric M. Davis
Judge

---

[76] *Diamond State Telephone Co. v. Univ. of Del*, 269 A.2d 52, 55-56 (Del. 1970).